distinct person from E. A. Parsons, original obligee in the bond, and is entitled to sue on this bond, in the present case, in her separate individual capacity.

Therefore, regardless of the fact that Parsons bought in these liens at a discount in the foreclosure proceedings in this case, Mrs. R. Marks, the plaintiff herein, suffered, as against her mortgages, the full loss of $10,-005.02 by the payment of these liens out of the price of adjudication and by priority over her mortgage notes. This defense of the bonding company is therefore without merit in the present case.

Practically the same issues here involved are discussed and decided in the suit of E. A. Parsons v. United States Fidelity & Guaranty Company et al., this day handed down.

For the reasons assigned in that case, and under the state of facts found in the present case, we are of the opinion that the judgment appealed from is correct.

Judgment affirmed.

(117 So. 820)

No. 29196.

### STATE v. HARRIS.

June 4, 1928. Rehearing Denied July 2, 1928.

Loys Charbonnet and William J. O'Hara, both of New Orleans (Daly & Hamlin, of New Orleans, of counsel), for appellant.

Percy Saint, Atty. Gen., and Eugene Stanley, Dist. Atty., J. Bernard Cocke, Asst. Dist. Atty., both of New Orleans (Theodore H. McGiehan, of New Orleans, of counsel), for the State.

BRUNOT, J. The accused was charged with murder; the defense was an alibi; the trial resulted in an unqualified verdict of guilty as charged; and the court sentenced the accused to be hanged. From the verdict and sentence he appealed.

There are eleven bills of exception in the record.

### Bill No. 1.

This bill was reserved to the overruling of a challenge of a juror for cause. The bill recites that the day after the juror James H. Holmes had been examined on his voir dire and accepted by the state and the defense, and after other jurors had been accepted and sworn, but before the jury was completed, counsel for defendant learned that juror Holmes was the father of a girl who was the prosecuting witness in a rape case,

and that William J. O'Hara, one of the defense counsel in this case, was the attorney for and had successfully defended the accused in the rape case. The attention of the court was called to this fact, and counsel for the defendant asked that the juror be excused for cause. The court thereupon examined the juror in the presence of the other nine jurors of the panel, but out of their hearing, and in the presence of counsel for defendant. The per curiam to this bill is, in part, as follows:

"The reasons assigned by the court in his written reasons for overruling the motion for a new trial as to paragraph No. 1 of said motion completely cover, in my opinion, this bill of exceptions.

"Said reasons, as also the testimony covering the examination of the juror Holmes on his voir dire (Tr. p. 124), the order dictated in chambers (Tr. p. 130), the court's examination of Holmes (Tr. p. 131), the opinion of the court holding the juror Holmes entirely competent (Tr. p. 136), are hereby made the per curiam to bill No. 1."

The examination of juror Holmes on his voir dire, and by the court after he had been accepted and sworn as a juror, may be dismissed from consideration for the reason that the only complaint of defendant is that, some time in the past, one of his counsel had successfully defended a man who was then charged with raping the juror's daughter. The court's reasons for holding the juror competent to try the case follow:

"The court will consider paragraph 1. The paragraph is too lengthy to have its substance as to facts recited here; it is sufficient to say that it involves the question of the discretionary powers of the court, to either excuse or retain for service, a juror who has already been examined and selected by both sides and sworn as a juror when his incompetency is urged. The facts touching the incident appear in the transcript and show the examination of the juror herein, James H. Holmes, on his voir dire, his acceptance for service by both sides, and his being sworn as a juror; his subsequent examination by the court before the jury was completed, for the reasons appearing in the transcript immediately prior to the court's examina-

tion; and finally of the court's ruling that the juror Holmes was competent.

"The court finds the law to be that if, after a juror has been accepted and sworn, it is discovered that he is incompetent to serve, the judge may, in the exercise of a sound discretion, at any time before evidence has gone to the jury, order him to be set aside and the panel to be completed in the ordinary course, whether the disqualification be because of the juror's conscientious scruples against the infliction of capital punishment, or because of his relationship to defendant, or because the juror has become incapacitated by illness. Under such circumstances, arising before the impaneling of the jury is completed, the court is justified, in the exercise of its discretion, to remedy the situation called to his attention, and to examine the jurors sworn, upon the matter of incompetency suggested, and to excuse those found subject to challenge and for cause. Marr's Crim. Juris. vol. 1, pages 703–704. 'It is well settled that the trial judge may, after the jury has been impaneled and sworn, discharge a juror who has become physically incapable of serving on the jury.' See State v. Costello, 11 La. Ann. 283; State v. Diskin, 34 La. Ann. 919, 44 Am. Rep. 448; State v. Lawson, 36 La. Ann. 275; State v. Moncla, 39 La. Ann. 868, 2 So. 814; State v. Nash & Barnett, 46 La. Ann. 194, 14 So. 607; State v. Duvall, 135 La. 710, 5 So. 904, L. R. A. 1916E, 1264.'

"The above excerpt is taken from the body of the decree in State v. Carmouche, 141 La. 328, 75 So. 69. See, also, State v. Nash, 46 La. Ann. 194, 14 So. 607; State v. Hill, 46 La. Ann. 736, 15 So. 145; State v. Moncla, 39 La. Ann. 868, 2 So. 814; State v. Diskin, 34 La. Ann. 919, 44 Am. Rep. 448.

"The facts covered by this paragraph do not fall under either of the several situations above described, when the trial judge undoubtedly has the right to exercise sound discretion in excusing a juror after he has been examined, accepted, and sworn, and before evidence has gone to the jury.

"In the instant case defendant's counsel urged the incompetency of the juror Holmes, after he had been sworn and before the jury was completed, for reasons which they alleged were unknown to them before the examination and acceptance of the juror and before he was sworn.

'It is the general rule that the proper time for both the state and the prisoner to urge objections to a juror for cause is before the juror is sworn, and the right of further questioning and challenging for cause is, as a general thing, waived and lost after the swearing of the jury.

State v. Craighead, 114 La. 84, 38 So. 28; State v. Isaac, 3 La. Ann. 359; State v. Dubord, 2 La. Ann. 732; State v. Kennedy, 8 Rob. 596.

"This rule suggested that, in the interest of justice, the court, after the reasons suggested for incompetency had been laid before him in chambers, should examine the juror Holmes upon the matter complained of.

"The transcript will show that the court dictated to the stenographer, in chambers, in the presence of counsel for the state and defendant, the nature of the complaint, in detail, describing a state of facts which defense counsel suggested showed the incompetency of the juror. The court determined to question the juror Holmes, which he did when court reconvened at the afternoon session.

"The juror was examined by the court under oath, in a low tone, in the presence of the remaining ten jurors, but out of their hearing, and in the presence of the two prosecuting officers and one of defendant's counsel; Mr. O'Hara, one of defendant's counsel, remained near the latter and did not hear the examination.

"The incident from beginning to end was orderly; the examination showed no basis for the reasons urged as showing the juror's incompetency. His examination upon his voir dire showed him to be qualified in every way; his examination as to the incident emphasized his fairness, truthfulness, and conscientiousness, and discredited the least suggestion of prejudice."

After an exceptionally thorough and searching inquiry, the trial judge found nothing suggestive of the incompetency of the juror. We have read the record carefully and have reached the same conclusion. Defendant seems to rely upon certain expressions of this court in State v. Joiner, 163 La. 609, 112 So. 503. There is no analogy between that case and the one at bar. In the Joiner Case a juror was being examined upon his voir dire. He had formed an opinion which it would require evidence to remove. He was a close friend of the state's chief witness. He had been a personal friend of the deceased. The latter had met his death because he attempted to prevent the accused from maltreating the state's chief witness, and this witness had communicated

the purported facts of the case to the juror. Under the recited facts, this court held that—

The "court is not bound by the answers of a juror on his voir dire, when they are opposed to and inconsistent with the facts and circumstances disclosed by his examination."

## Bill No. 2.

■■ This bill was reserved to the exclusion of certain testimony the defendant sought to introduce. Gowan Harris, a witness for his son, the defendant, had testified that, on a certain night, the police searched his house. He said:

"When the knock came which you heard me say, I answered, I called, who was there. The answer came, the police. I went to the front door and let them in. They asked me was Pleasant or Pleasant Harris there. I answered no. I asked them what was the matter, and they said he killed Catherine Wilson."

After the witness had explained the manner in which the house was searched, counsel for defendant proceeded with the examination of the witness as follows:

"Q. Now, when the police stated they were looking for Pleasant with a statement he killed Catherine Wilson, did you ask them anything? Did you say anything?
"A. Yes, I did ask them a question.
"Q. Well, please state it.
"A. Please state it?
"Q. Yes.
"A. I asked them if they knew that he had killed Catherine Wilson or not.
"Q. What was the answer?"

The district attorney objected to the witness stating what the police said in response to his question, upon the ground that it called for the opinion of the police and was not admissible, as being of no evidentiary value. It had been shown that the defendant was not present, but was then avoiding arrest by flight. In the per curiam to this bill the court says:

"If the police knew that accused had killed Catherine Wilson, their testimony to that effect should have gone to the jury direct from their lips, and not by violation of the hearsay

rule; if, as a fact, they did not know that the accused had killed Catherine Wilson, then, whatever they might have said would have amounted only to an opinion. * * * Defense counsel in their bill urge that the said ruling was prejudicial 'because if the said * * * witness (Gowan Harris) had been permitted to give the entire conversation, he would have testified that the police had stated to him that they did not know that his son, defendant herein, had killed the deceased, * * * but that they were simply investigating the killing of Catherine Wilson.'"

We think the ruling is correct. What the police might have said to the witness was not admissible for several reasons. It was objectionable as being hearsay, as calling for an opinion of the police, and as being of no probative value, and therefore irrelevant. It is the fixed jurisprudence that hearsay evidence, not a part of the res gestæ, should be excluded.

## Bill No. 3.

■ This bill was reserved to a ruling of the court sustaining the state's objection to witness Gowan Harris relating what his son, the accused, had said to him when advised by witness to get out of the way until it could be seen what would be developed. A recital by the witness of what his son said to him when he advised flight would be hearsay, and for that reason alone, if no other reason existed, it was properly excluded.

## Bill No. 4.

■■ This bill was reserved to the part of the judge's charge relating to manslaughter. It merely recites that the charge was objected to for the following reason:

"That the said charge of the court on manslaughter was not full and complete and had no application to the case on trial, and that the said charge failed to include and to cover the law of manslaughter applicable to the case on trial."

There is nothing in the bill to indicate in what particular respect the charge is not ap-

plicable to the case on trial, and in what respect, if any, the charge is incomplete. If objectionably incomplete or otherwise erroneous, the court should have been given an opportunity by specific objection, seasonably made, to correct the error. Omissions in the judge's charge, which he was not requested to supply, are not error. State v. Scossoni, 48 La. Ann. 1464, 21 So. 32.

The charge in this case was murder and the defense was an alibi. It would seem, therefore, that in the absence of some specific objection to the charge, the law would have been complied with if the judge had merely defined manslaughter and directed the attention of the jury to the distinction between that crime and the crime of murder, with proper instructions as to the several verdicts they might render. The judge not only did this, but the charge is sufficiently full, in the absence of specific objections thereto, to meet the requirements of the law in prosecutions for manslaughter. It is not necessary to quote the charge. It appears at pages 32–33 of the Transcript.

### Bill No. 5.

▇ This bill was reserved to the refusal of the court to specifically charge the jury as follows:

"I charge you that if a person, without malice, expressed or implied, while in the commission of an unlawful act, such as assault, beating and wounding, assault and battery, or while negligently operating an automobile, or in the commission of any other such unlawful act, causes the death of another, the crime would be manslaughter."

The judge in his per curiam to this bill says:

"The special charge set forth in bill of exception No. 5 was refused by the court because it was not justified by the facts of the case, and incorrectly states the law. The court submits, by way of per curiam, the entire charge read to the jury in this case. The said charge fully, completely, and correctly covers the law applicable to the present case."

The charge appears in the Transcript at pages 27 to 34, inclusive, and, in our opinion, it is a sufficiently complete statement of the law applicable to the case.

It has been the rule in this state, for many years, that a judge should refuse to charge abstract legal propositions whether they be correct or incorrect. During the interim between the decisions of the cases of State v. Stouderman, 6 La. Ann. 286, and State v. Hogan, 117 La. 872, 42 So. 355, the decisions of this court adhering to that rule are so numerous that it is not necessary to cite the particular cases.

### Bills Nos. 6, 7, 8.

These bills, like bill No. 5, present only abstract legal propositions, and the requested charges were properly refused.

### Bill No. 9.

▇ This bill was reserved to the overruling of a motion for a new trial. The motion for a new trial is merely a reiteration and amplification of the grounds of objection set forth in defendant's bills of exception from 1 to 8, both inclusive, except that it is also alleged in the motion that a witness, Edward L. Ramsey, while on cross-examination, was asked by the assistant District Attorney whether or not, during the month of March, he had been in the offices of Mr. St. Clair Adams and Mr. O'Hara, and there, at the solicitation of Mr. Gowan Harris, the father of the accused, gave counsel for the accused the benefit of his evidence as a state witness. This cross-examination of the witness went to the jury without objection, and it was not until after the verdict, and until the motion for a new trial was filed, that objection to it was first urged.

Stripped of verbiage that may be termed a "smoke screen," the objection is that the cross-examination of Ramsey was prejudicial to the accused because the court had ruled that juror Holmes was a competent juror

If objectionable, the cross-examination should have been objected to timely.

"It is not error to refuse a new trial on the ground that certain evidence was admitted, where no objection was made when it was received." State v. Baptiste, 26 La. Ann. 134; Marr's Criminal Jurisprudence, vol. 2, § 588, p. 907.

Moreover, there is nothing in the record which indicates any connection whatever between juror Holmes and witness Ramsey, or what effect, if any, the cross-examination of the witness had upon juror Holmes, different from its effect upon the other jurors.

### Bill No. 10.

This bill was reserved to the overruling of the alleged errors suggested in bill No. 1 and in paragraph No. 1 of defendant's motion for a new trial. The rulings on bills of exceptions Nos. 1 and 9 dispose of this bill.

### Bill No. 11.

This bill was reserved to the overruling of a motion in arrest of judgment. The motion is based upon the alleged ground that tales jurors to complete the jury to try the defendant were drawn from a jury wheel which contained less names than the law requires.

After the regular jury panel was exhausted, the court ordered 130 tales jurors drawn from the jury wheel. This order was complied with, and a sufficient number of tales jurors were accepted and sworn to complete the jury. The attack upon the drawing of the tales jurors was first made in defendant's motion for a new trial, and on the hearing of that motion the state objected to any evidence to support that attack, for the reason that Act 114 of 1921, as amended by Act 337 of 1926, specifically provides that no objection to the manner of drawing any juror, or jury, and no defect, or irregularity against any array or venire, can be filed, pleaded, heard, or urged, after the expiration of the

third judicial day of the term for which said jury had been drawn. The court reserved its ruling on this objection and permitted the evidence to go in the record. The evidence on this point appears in the Transcript, vol. 2, pp. 311 to 354. We have read the evidence carefully and concur both in the finding of fact and the reasons of the trial judge for overruling this motion, which reasons we quote in full:

"Paragraph 12 of defendant's motion for a new trial alleges, in substance, that on May 23, 1927, after the trial of defendant had begun, and before the jury was completed, the regular jury panel being exhausted, the court ordered that 130 tales jurors be drawn from the jury wheel, and that from the said 130 tales jurors so ordered, 2 jurors were actually drawn, examined, and sworn as jurors to try the defendant; that defendant made no objection at the time of the drawing of these tales jurors, for the reason that the court upon its own inquiry, in open court, and in the presence of defendant and his counsel, was informed by the chief deputy criminal sheriff for the parish of Orleans, in charge of the jury wheel, that there were 740 names in the jury wheel at the time.

"That subsequently, after the return of the verdict of the jury herein, defendant was informed and believes, and therefore alleges, that the time of the drawing of the tales jurors on May 23, 1927, in open court, there were not 740 names in the said wheel, but that there were less than 600 names, the minimum number required by law, in the said wheel.

"Defendant goes on to allege, in sections A and B of this paragraph of his motion for a new trial, that a large proportion of the said names, and a proportion sufficient to reduce physically the number of names in the jury wheel, consisted of the names of persons whose names had been ordered by the judges of this honorable court to be excluded from the said jury wheel and their names stricken from the rolls of the jury commissioners for jury service, and a certain proportion of the persons whose names were contained in the jury wheel were persons who, to the knowledge of the jury commissioners, could not be located and produced for jury service in the city of New Orleans, but were the names of persons who were left in the jury wheel by the jury commissioners, notwithstanding the fact that they knew that those names did not properly belong in the said jury wheel.

"Section C of paragraph 12 of the motion for a new trial contends that 51 of those names had been ordered out of the jury wheel at various times by various sections of this honorable court, and the defendant alleged that he had a right to believe that the same proportion would exist when an examination and check of all the names in the jury wheel, at the time of the selection of the tales jurors aforesaid, is made.

"In section D of paragraph 12 of the motion for a new trial, the defendant alleges that the minutes of section D of the honorable the criminal district court for the parish of Orleans show that on May 31, 1927, during the progress of another trial in section D of the criminal district court for the parish of Orleans, * * * that the criminal sheriff informed the court that there were 707 names in the said jury wheel, whereupon the trial judge of section D ordered 100 names drawn from the said jury wheel to serve as tales jurors in the trial of the said case. That on June 1, 1927, after the aforesaid 100 tales jurors were exhausted, and the jury in the said case not having been completed, 200 additional tales jurors were ordered drawn by the said trial judge, and it was found impossible on the said date of June 1, 1927, to comply with the said order, because there were only 143 names in the said jury wheel. These are the allegations of paragraph 12.

"At the hearing, when counsel for defendant sought to introduce evidence in support of the allegations contained in paragraph 12, the state, through the district attorney, objected on the ground that under the provisions of section 2 of Act 114 of 1921 (as amended by Act 337 of 1926), no objection to the manner of drawing any juror; or jury, and no defect or irregularity set up against any array, or venire, may be filed, pleaded, heard, or urged after the expiration of the third judicial day of the term for which said jury shall have been drawn; the state, through the district attorney, made the further objection that all objections to the selection or drawing of a jury must be urged before entering on the trial of the case; that since no objection was made by defendant's counsel (as clearly appears in the motion) to the drawing of these tales jurors, for any reason whatever, it was too late after verdict to make the objection that the jury wheel did not contain the minimum number of names required by law.

"In support of his contention, the district attorney cited to the court the cases of State v. Wright, 150 La. 516, 90 So. 833; State v. Bell, 146 La. 89, 83 So. 419; and State v. Dorsey, 138 La. 410, 70 So. 343.

"The court, in its discretion, announced he preferred to permit the defense to administer proof in connection with its offer. (The court had either to immediately sustain the objection, in which case the learned justices of the Supreme Court, in the event of an appeal, would have been minus the testimony on this point, or the court had to reserve its ruling on the objection and permit the offer of proof so that the Supreme Court might have the testimony for what it might be worth.)

"The defendant, through counsel, introduced as a witness Mr. M. J. McKay, chief deputy criminal sheriff for the parish of Orleans, who testified in substance as to the condition of the jury wheel from figures given him by the jury commissioners.

"Mr. McKay's testimony will be found in full in the record.

"Mr. McKay did testify, however, that on May 23, 1927, when the court ordered the drawing of tales jurors in this particular case, his records disclosed the fact that there were 740 names contained in the said jury wheel; that he had been drawing juries for a number of years, and that from his observation of the wheel at the time he drew the said 130 tales jurors (May 23, 1927), he (Mr. McKay) believed and stated as a fact that there were 740 names in the jury wheel.

"Reserving the benefits of the objection made by the state, upon which the court reserved its ruling, the district attorney then placed on the stand one of the jury commissioners, Mr. Thomas Russell, who testified that on May 23, 1927, when the tales jurors were ordered in this case, the wheel contained 740 names.

"No effort was made by the defendant to prove the allegations of sections A, B, and C of paragraph 12 of the motion for new trial by showing that the wheel contained the names of persons whose names had been ordered by the judges of this court to be excluded from the wheel, and their names stricken from the rolls of the jury commissioners for jury service.

"The court is not interested in the condition of the jury wheel as it existed in section D of this honorable court on May 31, 1927, and June 1, 1927, after the return of the verdict herein, but is interested only in knowing the condition of the jury wheel as it existed on May 23, 1927, when the 130 tales jurors were ordered by the court in the instant case.

"If the testimony of Mr. M. J. McKay as to the condition of the jury wheel on May 23, 1927, when the 130 names were ordered from the wheel as tales jurors in this case, be correct (and the court has every reason to believe it is correct), then there were 740 names in the wheel at the time the court ordered 130 tales jurors drawn to serve in this case.

"Mr. Russell, a jury commissioner, testified that on May 23, 1927, when the court ordered the tales jurors in this case, there were 740 names in the said jury wheel. The court states that at the time the tales jurors were called, the defendant had not exhausted his peremptory challenges, but merely mentions this as a matter of fact; the court disposing of the point as to the facts concerning the number of names in the wheel raised in paragraph 12 of the motion, without reference to these peremptory challenges.

"The court concludes, and is convinced, that, at the time of the drawing of the tales jurors in this case, there were 740 names in the jury wheel.

"Independently of this finding regarding the number of names in the jury wheel when tales jurors were drawn, the court has conscientiously examined the situation at this point and finds as a solemn fact that no incident touching the point raised suggests, even in the remotest manner, that the defendant suffered any injury.

"The testimony at the hearing on this paragraph disclosed no fraud of any kind, nor wrong inflicted upon the defendant in the selection and drawing of the jury.

"In the case of State v. Johnson, 47 La. Ann. 1092, 17 So. 480, your honors held: 'There is no evidence that any fraud has been practiced upon the accused, or any great wrong inflicted upon him in the selection and summoning of the jury that would work irreparable injury. Unless the irregularity in the drawing and the summoning of the jury produce such a result, the accused cannot complain. Sec. 9, Act 89 of 1894; State v. Taylor, 44 [Ann.] An. 783, 11 So. 132; State v. Green [Ann.] 43 An. 402, 9 So. 42; State v. Simmons, 43 [Ann.] An. 991, 10 So. 382; State v. McCarthy, 44 [Ann.] An. 324, 10 So. 673.'

"The court is of the opinion, however, that under the provisions of Act 114 of 1921, as amended by Act 337 of 1926, the attack on the jury wheel for the first time after verdict, in the motion for a new trial, counsel expressly alleging in this motion, that they did not know the condition of the jury wheel at the time the tales jurors were ordered, and made no objection to the said jury wheel at the time the said tales jurors were so ordered, is untimely and cannot be considered.

"See State v. Wright, 150 La. page 518, 90 So. 833.

"The court quotes from the syllabus in the case of State v. Bell, 146 La. page 89, 83 So. 419, as follows: 'Where in a prosecution for murder the regular venire has been exhausted, and three names are drawn from the tales box, but not placed in the jury box, from which the last juror is drawn, the defendant's consent to calling talesmen from the courtroom and his failure to object to the manner of proceeding constitutes a waiver of the irregularity.'

"In the case of State v. Dorsey, 138 La. page 410, 70 So. 343, the Supreme Court held: 'Where * * * the names of tales jurors ordered by the court to be drawn for service in a case on trial are drawn from the tales jury box by the sheriff in open court, in the presence of the judge and the clerk, and no objection is made at the time, it is too late after verdict to make the objection that the names should have been drawn by the clerk.'

"The objection originally urged by the district attorney to the defendant's offer of proof in connection with paragaph 12 is presently overruled, in order that the record may appear complete for any purpose."

Finding no reversible error in the record, it is decreed that the verdict, judgment, and sentence appealed from be affirmed.